IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SHELLY H. SEAVERSON,

                       Plaintiff,                     OPINION AND ORDER

      v.

                                                    20-cv-486-wmc

UNUM INSURANCE COMPANY OF
AMERICA,

                       Defendant.

In this lawsuit, plaintiff Shelly H. Seaverson contends that defendant Unum Insurance Company of America ("Unum") violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), by terminating her long-term disability insurance benefits.  Before the court are the parties' cross-motions for summary judgment. (Dkt. ##27, 31.)  Under an arbitrary and capricious standard of review, the court must grant defendant's motion for summary judgment, finding that the defendant presented a reasoned explanation for the termination of Seaverson's benefits.

UNDISPUTED FACTS[1]

**A. The Plan**

Well before plaintiff Shelly Seaverson's employment, Unum issued a Long-Term, Disability Insurance Policy No. 351888 (the "Policy") to SSM Health under the "SSM

---

[1] The undisputed facts are drawn from the administrative record, which is unfortunately only provided in a disorganized fashion across seven docket entries.  (Dkt. ##19-25.)  For future reference, defendant should file the administrative record in order of page number, preferably in one docket entry, or if that is not possible, then at least by providing the page numbers in each docket entry for ease of review.

Health Care Plan" (the "Plan").  The Plan is an employee welfare benefit plan subject to

the Employee Retirement Income Security Act of 1974 ("ERISA").  In part, the Plan's

Policy states as follows:

> How does Unum define disability?
>
> You are disabled when Unum determines that:
> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury;
> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury; and
> - during the elimination period, you are unable to perform any of the material and substantial duties of your regular occupation.
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of gainful occupation for which you are reasonably fitted by education, training or experience.

(AR (dkt. #24) 004222 (emphasis omitted).)  The Policy further states:

> When will payments stop?
>
> - the date you are no longer disabled under the terms of the pla[]n;
> - during the first 24 months of payments, when you are able to work in your regular occupation on a part-time basis but you choose not to do so.

(*Id.* 004228 (emphasis omitted).)

"Limited" is defined as "what you cannot or are unable to do."  (*Id.* at 4234.)

"Material and substantial duties" are duties that:

> - are normally required for the performance of your regular occupation; and
> - cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Unum will consider you are able to perform that

2

> requirement if you are working or have the capacity to work 40 hours per week.

(*Id.* at 004234.)  "Regular occupation" is defined as:

> the occupation you are routinely performing when your disability begins.  Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

(*Id.* at 004236.)

Finally, material to determining the appropriate standard of review, the Policy also states that:

> The Plan, acting through the Plan Administrator, delegates to Unum and its affiliate Unum Group discretionary authority to make benefit determinations under the Plan.  Unum and Unum Group may act directly or through their employees and agents or further delegate their authority through contracts, letters or other documentation of procedures to other affiliates, persons or entities.  Benefit determinations include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan.  All benefit determinations must be reasonable and based on the terms of the Plan and the facts and circumstances of each claim.

(*Id.* at 004242-43.)

As described in the Policy, Unum administers and insures claims for benefits arising under the Plan, determines eligibility and pays LTD benefits.  The LTD benefit is equal to 50% of the participant's monthly earning, up to a maximum of $10,000, and reduced by any deductible sources of income.  For participants under the age of 60 at the time of disability, the maximum period of payment is to age 65.

**B. Plaintiff Seaverson's Employment**

Before her employment by SMS Health, plaintiff Shelly Seaverson has a history of spinal scoliosis, narrowing of lumbar disc space, and a C2-3 congenital cervical fusion causing chronic neck and back pain. She also mentions having been diagnosed with Klippel-Feil syndrome, "a rare disorder characterized by the congenital fusion of two or more cervical (neck) vertebrae." Klippel-Feil Syndrome Information Page, National Institute of Neurological Disorders and Stroke, https://www.ninds.nih.gov/Disorders/All-Disorders/Klippel-Feil-Syndrome-Information-Page. Seaverson represents that her neck and back pain worsened following a motor vehicle accident in 2011; and by 2013, Seaverson was diagnosed with degenerative disc disease from C3 to C7 and left neural foraminal stenosis at C6-C7.

Seaverson began work for SSM Health Care ("SSM Health") as a Case Management Specialist on March 11, 2013. In that position, she was responsible for performing disease/case management administrative and triage functions, as well as provided administrative support to case managers, including data collection and reporting. This was a sedentary position, which required occasionally exerting up to 10 pounds, mostly sitting and occasional standing and walking, and frequent handling and fingering. As an employee of SSM Health, Seaverson became eligible for certain benefits under the Plan, including long-term disability ("LTD") benefits at the start of her employment with SSM Health.

In 2013, she underwent multiple, additional procedures for her pain, including a nerve root block, transforaminal steroid injection and a selective nerve root injection. On January 30, 2014, she underwent a posterior cervical left foraminotomy at C3-4, which

4

was unsuccessful in providing pain relief.  Seaverson also attended 30 occupational and physical therapy sessions from February 18, 2014, through August 11, 2015.

On May 6, 2015, some seven months before her approval for LTD benefits under the Plan, Seaverson underwent a cervical MRI that showed a developmental C2-C3 fusion with facet ankylosis and a small hypoplastic intervertebral disc, and disc protrusion at C5-C6.  On June 10, 2015, Seaverson next sought treatment from her primary care physician at that time, Robert Terbrack, D.O.  At that appointment, Seaverson reported pain with flexion, extension, bilateral rotation and side bending, and also reported tight trapezius muscles bilaterally and a decreased range of motion in all cervical planes.

On June 12, 2015, at the age of 34, Seaverson ceased working at SSM Health, reportedly due to cervical radiculopathy and carpal tunnel syndrome, and on September 23, 2015, having just turned 35, she submitted a claim for disability benefits under the Plan.  Other than making and selling jewelry and crafts, Seaverson has not worked in any capacity since June 12, 2015.  With a birth date of September 11, 1980, plaintiff is now 41 years old.

### C. Plaintiff's LTD Benefits Claim

On June 24, 2015, Dr. Terbrack completed an Attending Physician Statement, indicating that Seaverson was unable to work from June 15 for 12 weeks due to cervical radicular pain and displacement of cervical intervertebral disc.[2]  Dr. Terbrack reiterated his

---

[2] From this time until September of 2017, plaintiff was ultimately deemed disabled and covered by the plan; therefore, the records from this period are arguably less relevant to her appeal, but as with Seaverson's pre-employment records, the court sets forth a number of the proposed findings of fact for context and to better understand her claim of ongoing disability.

view that she could not work in follow-up forms dated June 24, July 20, September 17, and September 23, 2015.  From June through September 2015, therefore, Dr. Terbrack administered therapeutic injections and also prescribed various medications to treat her pain.  In December 2015, Seaverson also began to see a neurosurgeon, Dr. Gregory Trost, who also agreed that she was unable to work, completing forms in December 2015 and May 2016.  On December 15, 2015, Dr. Trost also evaluated Seaverson for left arm and hand pain, diagnosing her with carpal tunnel syndrome, and Seaverson underwent left carpal tunnel release on December 18, 2015.

Unsurprisingly, Unum approved Seaverson's LTD claim in December 2015 as well, with payments retroactive to June 15, 2015, and paid out through July 12, 2016, at which point Unum concluded that Seaverson had the functional capacity to perform her regular occupation.  However, Seaverson appealed that decision, and after review on appeal, Unum agreed to reopen her claim in January 2017 and renewed paying her LTD benefits.

During this same time frame, Seaverson continued to undergo medical evaluation and treatment.  For example, by April 2016, Dr. Trost had concluded that Seaverson would benefit from a 2-level cervical discectomy and fusion at C5-C6 and C6-C7.  While that surgery was originally scheduled for June 2016, it was apparently canceled due to her lack of insurance.  Nevertheless, in May 2016, Seaverson returned to Dr. Terbrack for care, complaining of musculoskeletal issues causing daily headaches, neck pains, limited range of motion of the neck, arm pain, and numbness and tingling in the arms and hands.  As a result, Dr. Terbrack completed a form on May 25, 2016, in which he stated that Seaverson's current restrictions included "inability to remain stationary for > 30 minutes,

restricted from sitting > 30 minutes at one time, inability to grasp, no lifting > 5 lbs, minimal keyboarding, minimal fingering or handling due to [decreased] sensation and strength and [increased] pain." (AR (dkt. #21) 001661.) On June 15, 2016, Dr. Terbrack explained that Seaverson had "current work restrictions that are in place by me personally," but that she did not receive restrictions from specialists because they "do not provide work restrictions and parameters," consistent with SSM Health Dean Care's practice. (AR (dkt. #20) 002585.) On November 10, 2016, Dr. Terbrack limited Seaverson to lifting no more than 10 pounds; frequent position changes; no bending or twisting; no reaching with arms; and indicated that her concentration is limited by pain.

On March 23, 2017, Seaverson also underwent C5-7 fusion recommended by Dr. Trost almost one year before, but claims it provided her minimal improvement. After that surgery, Seaverson continued to follow up with her physicians -- neurosurgeon Trost and primary care physician Terbrack. In June and August 2017, Dr. Trost reported that plaintiff's "main complaints are of neck pain," while her "preop arm pain seems to be significantly better." (AR (dkt. #25) 002994.) On August 2, 2017, Dr. Trost advised Unum that Seaverson was unable to work, had been unable to work since December 15, 2015, and that she could not lift, bend or twist after her March 23, 2017, surgery. In response to a request from Unum, on August 10, 2017, Dr. Trost reiterated that Seaverson was not able to lift, bend or twist after surgery and could not perform sedentary work due to neck and arm pain. (AR (dkt. #20) 000815-16.) Dr. Trost further indicated that Seaverson needed therapy before returning to work and was scheduled to be reevaluated on August 29, 2017.

On August 21, 2017, Seaverson also saw Dr. Terbrack for opiate withdrawal as she had been taken off narcotic pain medications.  Dr. Terbrack noted that the pain management provider was no longer willing to provide her medications since she had a recent neurological surgery that was supposed to remove her need for pain medications. Plaintiff does not dispute this but also points out that her pain management specialist, Dr. Simhan, also explained that narcotics would be ineffective to treat her pain since it was not nerve-related and also declined to prescribe narcotic medication since she had recently attempted suicide.  Instead of prescribing opiates, Dr. Terbrack provided some medications for symptoms of nausea, abdominal cramping and anxiety and recommended acetaminophen and ibuprofen for her muscle pain.

On August 29, Seaverson returned to Dr. Trost.  X-rays from that visit revealed mild degenerative disc disease.  Dr. Trost noted that Seaverson had made significant progress since her last visit and was now in a reconditioning phase.  He also noted that her x-rays were satisfactory and released her from his care.

In a letter dated September 13, 2017, Trost's office indicated that plaintiff had been seen on August 29, had been discharged from the office but was continuing to participate in reconditioning physical therapy.  Plaintiff does not dispute this account but contends that Dr. Trost gave no indication that her restrictions had decreased or been lifted.  The same August 29 medical record noted that Seaverson's pain remained a four out of 10. Cervical x-rays were taken as part of the August 29 visit.  The x-rays noted degenerative disc disease and were consistent with incorporation of plaintiff's graft.  Trost found the x-rays satisfactory.  Plaintiff does not dispute this but also points out that the x-rays showed

partial congenital fusion of C2-3 and postoperative changes to C5-6 and C6-7.

In a call with a Unum disability benefits specialist on September 13, Seaverson herself reported that she was using the pool and taking walks for exercise and reported seeing a counselor, although she also noted that the counselor had not given her any restrictions.  Plaintiff does not dispute this account but contends that it is the role of her primary care physician -- not a counselor -- to impose restrictions.

On September 13, 2017, Unum next mailed Seaverson a letter requesting the following information for her to continue to receive benefits: (1) a copy of her medical records dated August 1, 2017, through the present from Seaverson's neurosurgeon Trost; (2) a copy of her medical records dated March 1, 2017, through the present from UW Research Park Spine Physical Therapy; (3) a copy of her medical records dated August 1, 2017, through the present, from her primary care physician Terbrack; and (4) pharmacy records from Edgerton Pharmacy and Walgreens since January 11, 2015.

On October 31, 2017, Dr. Trost's office reported that there were no restrictions after August 29, 2017, stating any limitations were based on pain and what plaintiff felt she could do.  Again, plaintiff does not dispute this account, but contends that Dr. Terbrack, as her primary care physician, was responsible for setting limitations, and that the fact that Dr. Trost did not describe any restrictions does not mean that she did not have restrictions from another doctor.

According to the administrative record, a Unum employee called Dr. Terbrack's office on October 31 at 8:18 a.m. to ask if he deferred to Dr. Trost with regard to restrictions and limitations.  (Pl.'s Resp. to Def.'s PFOFs (dkt. #35) ¶ 26 (citing AR (dkt.

#25) 003390).)  The Unum representative did not reach anyone at that time.  Later that day, at 12:58 p.m., the Unum employee called Dr. Terbrack's office again and spoke with a triage nurse, indicating that she "asked if AP Terbrack is deferring his opinion to EE's neurosurgeon AP Trost.  She states that he is."  (*Id.* (quoting AR (dkt. #25) 003390).)  Plaintiff contends that it is not clear from this notation whether the Unum employee asked the triage nurse about limitations and restrictions specifically or asked about Terbrack's opinion more generally.  Plaintiff also points out that Dr. Terbrack previously indicated, as described above, that it was *his* job to provide restrictions and limitations, rather than a specialist.  (*Id.* (citing AR (dkt. #22) 002585 (letter dated 6/25/16, explaining "Dean clinic routinely has the primary care provider complete work restrictions rather than the specialist as we are responsible for more comprehensive care.  This does not mean that our specialists do not believe the patient does not need restrictions, rather they leave it to the primary care provider.")).)[3]

On November 2, 2017, Unum again wrote Seaverson, "[a]s we have requested information we need to evaluate your continued entitlement to benefits, and you have not provided that information, we are suspending benefits, effective October 29, 2017."  (AR (dkt. #25) 003396.)  That letter again described the requested information as detailed above, then noted that more than 45 days had passed since it originally requested the information.  Consistent with its letter, Unum also suspended Seaverson's payments as of October 29, 2017.

---

[3] Plaintiff was also hospitalized in October 2017 for a "behavioral health condition," but does not claim that this condition, or any other mental health condition, was disabling.  (Def.'s PFOFs (dkt. #33) ¶ 66; Pl.'s Resp. to Def.'s PFOFs (dkt. #35) ¶ 66.)

The UW Pain Management records from December 2017 continued to recommend regular home exercise or physical therapy, and avoidance of certain neck postures when reading or using a computer.  The notes also reveal that it was recommended that Seaverson see a psychiatrist, but she declined.  On January 5, 2018, plaintiff had a right scalene injection, an injection into the scalene muscles of the neck of lidocaine, a mild local anesthetic, and dexamethasone, a corticosteroid to treat inflammation.  The exam revealed normal strength in her upper extremities, although plaintiff challenges whether she had "full strength in her upper arms at all times moving forward."  (Pl.'s Resp. to Def.'s PFOFs (dkt. #35) ¶ 73.)

In physical therapy records from September through December 2017, Seaverson reported pain from two up to six on a ten-point scale.  Unum represents that her pain was always a two or three, but as plaintiff points out she reported a flare up in neck pain and rated her pain as six out of ten at her December 12, 2017, appointment.  She also rated her pain as four out of ten at her December 29, 2017, appointment.

After additional attempts to obtain the requested information, however, Unum finally advised in a letter dated December 18, 2017, that it had closed her claim, having still not received the requested information.  (AR (dkt. #25) 003428-29.)  Nevertheless, on January 11, 2018, Seaverson sent 132 pages of medical records to Unum, consisting of x-ray reports and images, pain management records through January 5, 2018, and physical therapy records through December 29, 2017, including Dr. Trost's medical records.  At that time, Unum engaged a "medical resource" to review and provide an assessment of her medical records.  After review, that resource concluded Seaverson's medical records did not

support a finding that she was unable to perform at the sedentary functional capacity level required by her regular occupation.  In a letter dated February 9, 2018, Unum advised Seaverson that it declined to reopen her claim, explaining that:

> her treating physicians had not recommended restrictions and limitations after August 29, 2017, her medical condition did not prevent her from performing sedentary activities, that she was able to perform her duties of her regular occupation and was no longer disabled according to the Plan and benefits under the Plan were therefore not payable.

(Def.'s PFOFs (dkt. #33) ¶ 36 (citing AR (dkt. #23) 003610-13).)  However, plaintiff maintains that this explanation neither accurately reflected the record or her condition, nor otherwise justified denial of benefits.[4]

At her January 16, 2018, physical therapy appointment, Seaverson reported her neck felt looser after a scalene block and then returned to baseline.  Seaverson did not return to her next scheduled pain clinic appointment on March 7, 2018, and on March 20, 2018, the therapist noted that Seaverson had made significant progress and would be transferring to at-home exercises after initiation of lidocaine infusions.  Nonetheless, Seaverson had another physical therapy appointment on April 2, 2018, at which the therapist noted that plaintiff had a lidocaine injection that provided some relief and that she was exercising more consistently in the past week and on April 4, 2018, Dr. Peggy Kim at the UW Pain Clinic again recommended treatment with a mental health provider and

---

[4] As part of its review on appeal, Unum's "vocational resource" also reviewed the available information about Seaverson's job description, information provided by Seaverson in a phone call, and information on her employer's claim form.  The vocational resource concluded that Seaverson's job was consistent with that of a medical secretary, which requires a sedentary level of functional capacity, including mostly sitting, standing or walking for brief periods, exertion up to 10 pounds occasionally, constant keyboarding, and frequent handling and fingering.

also recommended that plaintiff participate in pain management lifestyle classes.  She stated that she had previously participated in similar groups and did not seem interested.

Seaverson returned for additional therapy on April 23, May 7, May 23, June 6, and June 12, at which she reported sleeping better and continuing her exercise, stretching and traction at home.[5]  On June 12, 2018, plaintiff's physical therapist Julie Sherry provided a letter to Unum in which she stated that Seaverson needed additional physical therapy before she could return to work.  In her letter, Sherry further stated that plaintiff had not made progress during 15 visits over nine months, though defendant points out that the office visit notes between September 5, 2017, and December 29, 2017, documented that Seaverson "tolerated the exercises without increased pain and demonstrated significant progress towards goals."  (Def.'s PFOFs (dkt. #33) ¶ 49 (citing AR (dkt. #23) 003501-34).)  Seaverson also engaged a new primary care physician, Dr. Meyer, in June 2018, who apparently evaluated her in person, but also reviewed her prior medical records.

On June 13, 2018, Seaverson next requested an appellate review, which Unum had performed by a different person than conducted the initial review in accordance with the Plan's terms.  Afterward, in a letter dated September 4, 2018, Unum affirmed its decision to terminate her coverage.  In that same letter, Unum explained that Seaverson had again been deemed able to perform the duties of her regular occupation as of October 29, 2017, and, therefore, no longer met the definition of disability under the Plan.  In the September 4, letter, Unum also provided the following:  (1) a copy of its the initial decision; (2) a

---

[5] Plaintiff attended 15 physical therapy sessions from September 2017 through May 2018.

copy of its decision on appeal; (3) information that supported the appeal decision; (4) Unum's specific response to concerns Seaverson had raised; (5) the applicable Plan provisions; and (6) next steps Seaverson could take.  Plaintiff does not dispute that all of this information was provided, but instead challenges:  (1) Unum's treatment of the opinion of her treating physician, Dr. Meyer; (2) Unum's interpretation of Dr. Trost's August 29, 2017, statement releasing Seaverson from his care; and (3) Unum's review of physical therapy records from her therapist Julie Sherry.  The court addresses these arguments in the opinion below.

Finally, defendant points to Dr. Meyer's June 27, 2018, office note suggesting an in-person evaluation of Seaverson "did not reveal significant findings or functional deficits on exam." (Def.'s PFOFs (dkt. #33) ¶ 87 (citing AR (dkt. #23) 003855.)[6]  Still, Dr. Meyer advised Seaverson to continue pain management and agreed to provide her with eight hydrocodone tablets, as long as she started treatment with psychology and continued her physical therapy.[7]  Dr. Meyer also recommended a trial of nortriptyline, a medication that treats nerve pain and depression.  Moreover, in an August 27, 2018, letter, Dr. Meyer wrote that "[a]t this time, she cannot work in any meaningful employment."  (AR (dkt.

---

[6] Plaintiff purports to dispute this as well, pointing to the same medical record (albeit with a different bates number), and representing that the record stated that Seaverson "was unable to engage in meaningful employment."  (Pl.'s Resp. to Def.'s PFOFs (dkt. #35) ¶ 87 (citing AR (dkt. #20) 000833-40).)  Instead, in summarizing Seaverson's medical concerns, the record states, "She is unable to work because of the pain and is living with her parents."  (AR (dkt. #20) 000836.)  While there is nothing about this notation to suggest that Dr. Meyer had formed such an opinion at that time, although as noted in the text above, Dr. Meyer did submit a letter in August of 2018 indicating that Seaverson could not work.

[7] Despite this agreement, there is no dispute that plaintiff has not pursued treatment with a psychiatry, psychology or mental health counselor.  (Pl.'s Resp. to Def.'s PFOFs (dkt. #35) ¶ 98.)

#23) 004173.)

OPINION

## I.  Standard of Review

The parties agree that in light of the grant of discretion to Unum in the Plan, the court should review Unum's decision to deny eligibility for ERISA insurance plan benefits under a "arbitrary and capricious" standard.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010).  In applying this standard of review to a denial of ERISA benefits in particular, the Seventh Circuit has stated in the past that the decision must be "downright unreasonable" before reversal by a federal court would be appropriate; still, the court clarified that observation in *Holmstrom*, explaining that the standard of review

> should not be understood as requiring a plaintiff to show that only a person who had lost complete touch with reality would have denied benefits.  Rather, the phrase is merely a shorthand expression for a vast body of law applying the arbitrary-and-capricious standard in ways that include focus on procedural regularity, substantive merit, and faithful execution of fiduciary goals.

615 F.3d at 766 n.5.  Thus, the Seventh Circuit cautioned in *Holmstrom* that the court is not a "rubber stamp."  615 F.3d at 766.  Instead, "[f]or ERISA purposes, the arbitrary and capricious standard is synonymous with abuse of discretion."  *Id.* at 767 n.7 (internal

15

citation, quotation marks and alterations omitted).[8]

More specifically, ERISA requires that "the administrator . . . weigh the evidence for and against [the denial of benefits], and within reasonable limits, the reasons for rejecting evidence must be articulated if there is to be meaningful appellate review." *Halpin v. W.W. Grainger*, 962 F.2d 685, 695 (7th Cir. 1992) (internal citation and quotation marks omitted). The court will, therefore, uphold an administrator's decision "if (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem." *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 686 (7th Cir. 2004) (internal quotation marks and citations omitted). The court reviews each of plaintiff's specific challenges to Unum's eligibility determinations under this standard below.

## II. Plaintiff's Challenges

### A. Conducted a Selective Review

Plaintiff initially criticizes defendant for conducting a selective review of the record by focusing on her having had no doctor-ordered restrictions in place by the end of August

---

[8] Plaintiff did not argue, but the court nonetheless notes, that Unum's dual role in determining eligibility and paying benefits under the Plan creates a conflict of interest as explained in *Kaiser v. United of Omaha Life Ins. Co.*, No. 14-CV-762-WMC, 2016 WL 379814 (W.D. Wis. Jan. 29, 2016). *Id.* at *5 (citing *Jenkins v. Price Waterhouse Long Term Disab. Plan*, 564 F.3d 856, 861 (7th Cir. 2009); *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)). While this conflict "does not alter the basic standard of review—an abuse of discretion standard still applies—it is properly 'weighed as a factor in determining whether there is an abuse of discretion.'" *Id.* (quoting *Glenn*, 554 U.S. at 115. As such, the court is mindful of this conflict in reviewing plaintiff's arguments.

2017.  ERISA requires that the plan administration "must address any reliable, contrary evidence presented by the claimant." *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397 (7th Cir. 2009); *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.").

As detailed above, Dr. Terbrack completed a form on May 25, 2016, before her March 2017 surgery, indicating that she had a number of restrictions in place, including "inability to remain stationary for > 30 minutes, restricted from sitting > 30 minutes at one time, inability to grasp, no lifting > 5 lbs, minimal keyboarding, minimal fingering or handling due to [decreased] sensation and strength and [increased] pain." (AR (dkt. #21) 001661.)   Dr. Terbrack modified these restrictions slightly on November 10, 2016, limiting Seaverson to lifting no more than 10 pounds; frequent position changes; no bending or twisting; no reaching with arms; and that her concentration is limited by pain. In June 2016, Dr. Terbrack also clarified that it was Dean Clinic's medical practice to rely on primary care physicians, like himself, rather than specialist, to set work restrictions.

Even so, plaintiff's neurosurgeon Dr. Trost set restrictions post-surgery.  In letters dated August 2, 2017, and August 10, 2017, Dr. Trost indicated that Seaverson could not work due to her neck and arm pain, specifically stating that she could not lift, bend or twist.   At Seaverson's August 29, 2017, appointment with, however, Dr. Trost noted significant progress since her visit on August 2, indicated that she was now in a "reconditioning phase," and released her from his care.  Plaintiff argues that this note, and a subsequent September 13, 2017, letter to Unum providing the same information, does

not mean that her restrictions had been lifted.  On October 31, 2017, however, Dr. Trost confirmed just that, noting no doctor-ordered restrictions in place after August 29, 2017, and indicating that any limitations were simply based on Seaverson's pain tolerance.  Even without Dr. Trost's October 31 clarifying note, defendant's interpretation -- that in releasing Seaverson from his care and noting her significant improvement, Dr. Trost's restrictions were no longer in place -- was a reasonable explanation of the record, especially in light of Dr. Trost offering no opinion about Seaverson's ability to work after August 29, 2017, or any restrictions that still may be in place.  With the October 31, 2017, note, Dr. Trost removed any doubt as to his opinion.

Plaintiff also argues that Unum failed to explain adequately why it rejected Dr. Terbrack's conclusion that she could not work based on the restrictions *he* had placed on her in May and November of 2016.  As described above, however, Dr. Terbrack placed restrictions on her *pre*-surgery, but there is no indication in the record that he intended for these restrictions to remain in place after surgery, especially in light of Dr. Trost's post-surgery directions.  While the record reflects that typically the primary care physician sets restrictions, at least within Dean's medical practice, there is no dispute that Dr. Trost, as plaintiff's neurosurgeon, set restrictions post-surgery.  Moreover, on October 31, 2017, an Unum employee checked with Dr. Trost's office to confirm that he had no specific restrictions or limitations for Seaverson.

While plaintiff disputes that Dr. Trost's office was asked this specific question, there is no dispute that Unum records indicate that Dr. Terbrack deferred to Dr. Trost's opinion, and that Dr. Trost's own October 31 note confirms no doctor-ordered restrictions on

plaintiff's activities after August 29, 2017.  Plaintiff's argument that one *could* nevertheless infer a different conclusion from the record proves too much under an arbitrary and capricious standard of review.  At minimum, defendant has articulated -- as it did in its September 4, 2018, letter denying Seaverson's appeal -- why it concluded she had no work restrictions in place after August 29, 2017, relying on Dr. Trost's and Dr. Terbrack's own opinions for support.[9]

### B.  Ignored Dr. Meyer's Opinion

Next, plaintiff contends that defendant acted unreasonably in rejecting Dr. Meyer's opinion, who first saw plaintiff on June 27, 2018.  In particular, Dr. Meyers issued an opinion two months later indicating that Seaverson could not work because of severe neck pain.  However, there is no indication in the record that Dr. Meyer actually saw Seaverson any other time between the June 27 visit and his August 27 letter opinion, or at least plaintiff has failed to direct the court to such evidence.  Thus, in rejecting Meyer's opinion, Unum explained in its September 4, 2018 letter:

> While Dr. Meyer has provided a letter dated August 27, 2018, now stating "she cannot work in any meaningful employment," this opinion was provided many months after your claim was closed effective Oct. 29, 2017.  Your first visit with Dr. Meyer was June 2018 and her opinion given in August 2018 [is] not relevant to your condition at the time your claim was closed in October 2017.  However, our medical resource did review Dr.

---

[9] Perhaps plaintiff could have argued that defendant ignored her continuing complaints of pain and self-imposed restrictions, but plaintiff does not point to evidence in the record to support a finding that her pain precluded her from performing sedentary work, and she expressly declined to rely on any psychological or addiction issues with opioids (*see supra* n.3), which may have opened up another avenue for benefits under the Plan.

> Meyer's office visit note dated June 27, 2017, which did not reveal significant findings or functional deficits on exam[.] This information did not change our medical resource's opinion with respect to the medical evidence of your functional capacity as of October 29, 2017.

(AR (dkt. #20) 000852.)

This court has ruled in the past that

> a Plan Administrator cannot request additional medical evidence and then simply reject that evidence on the basis that it post-dates the relevant termination or denial decision. As [the Seventh Circuit] explained, defendants' position would mean that an insurer's "termination of benefits for lack of supporting evidence could never by successfully appealed if the claimant had not already undergone . . . testing" before an initial denial. This is especially untenable in cases involving chronic conditions, like that at issue here.

*Clark v. CUNA Mut. Long Term Disability Plan*, No. 14-cv-412-wmc, 2016 WL 1060344 (W.D. Wis. Mar. 15, 2016 ) (quoting *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 776 (7th Cir. 2010)). However, the court does not read Unum's rejection of Dr. Meyer's August 2018 opinion as running afoul of the ruling in *Clark*.

As an initial matter, Unum did not request this additional opinion; in other words, Unum did not deny coverage because it lacked a medical statement from a primary care physician. To the contrary, Unum had reached out to and clarified Dr. Terbrack's opinion as to Seaverson's condition in October 2017. Even putting that aside, if Unum had rejected Dr. Meyer's opinion *solely* on the basis that it post-dated the relevant period, perhaps plaintiff's argument would have traction. However, as reflected in Unum's explanation above, it also rejected Dr. Meyer's August 2018 opinion because: (1) Dr. Meyer's contemporaneous notes from her June 2018 physical examination of Seaverson

20

did not reveal any "significant findings or functional deficits"; and (2) Dr. Meyer only saw Seaverson that one time before opining two months later that she was unable to work dating back to the June 2018 exam.  Again, at minimum, under an arbitrary and capricious standard, defendant provided a reasoned explanation for rejecting Meyer's October 2018 opinion.

### C. Impermissibly Moved the Target

Plaintiff further argues that defendant impermissibly "moved the target," by suspending her benefits as of October 29, 2017, for failing to provide the requested records, but then concluding on June 13, 2018, that she no longer met the definition of disability under the Plan as of October 29, 2017.  At best, this is an odd argument; at worst, it is a complete red herring.  Regardless, the fact that Unum initially suspended Seaverson's benefits as of October 29, 2017, because she had repeatedly failed to provide requested information, but once plaintiff provided the requested information on January 11, 2018, then reviewed the entire record, and determined that Seaverson no longer met the definition of disability under the Plan does not constitute "moving the target," at least not impermissibly so.  Far from it.  First, Unum reasonably reacted to the lack of requested documentation by suspending her benefits.  Second, once plaintiff rectified that situation by providing the requested medical documentation, Unum conducted two rounds of reviews of the records post-dating her surgery to conclude that she was no longer disabled.  Accordingly, the court sees no error -- under an arbitrary and capricious standard or otherwise -- in Unum's treatment of plaintiff's claim.

**D. Inadequacy of Review by Unum's Medical Resource**

Finally, plaintiff offers two challenges to the medical resource's review on appeal. First, plaintiff argues that the medical resource did not provide an adequate explanation. However, plaintiff stops short of providing any *specific* criticism of the medical resource's review -- other than again pointing to her treating physician's opinions, which the court already addressed in response to her other challenges.  Having failed to articulate where the medical resource fell short in explaining its review, the court cannot manufacture one for plaintiff.

Second, plaintiff contends, "ERISA requires that plan administrators engage a medical consultant who has appropriate training and experience qualified in the area of claimant's disability."   (Pl.'s Opp'n (dkt. #34) 3-4 (citing 29 C.F.R. § 2560.503-1(h)(3)(iii), as incorporated by 29 C.F.R. § 2560.503-1(h)(4)).)   Plaintiff argues that defendant failed to meet this requirement because the medical resource is described in the record as an internal appeals clinical consultant, who is a registered nurse.  However, the regulation simply requires that a plan engage a "health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment."  In particular, there is no requirement that the individual must be a doctor. Moreover, to the extent that plaintiff complains about defendant's use of an *internal* health care professional, Seventh Circuit rejected this very argument in *Davis v. Unum Life Insurance Company of America*, 444 F.3d 569 (7th Cir. 2006), finding it "reasonable . . . for an administrator to rely on its doctors' assessments of the file and to save the plan the financial burden of conducting repetitive tests and examinations." *Id.* at 577.  As such, the

court will reject this challenge as well.

In summary, having reviewed defendant's thorough September 4, 2018, letter, explaining its reasoning for terminating plaintiff's disability benefits as of October 29, 2017, the court concludes that defendant has provided a reasoned and reasonable explanation for this decision consistent with the record before it.  Accordingly, defendant Unum's motion for summary judgment will be granted and the case closed.

ORDER

IT IS ORDERED that:

1)  Plaintiff Shelly J. Seaverson's motion for summary judgment (dkt. #27) is DENIED.

2)  Defendant Unum Life Insurance Company of America's motion for summary judgment (dkt. #31) is GRANTED.

3)  Plaintiff's motion to expedite (dkt. #13) is DENIED AS MOOT.

4)  The clerk's office is directed to enter judgment in defendant's favor.

Entered this 2nd day of November, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge